# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2018AP669 |

| | |
|---|---|
| COMPLETE TITLE: | State of Wisconsin ex rel. Ronald L. Collison, Petitioner-Appellant-Petitioner, v. City of Milwaukee Board of Review, Respondent-Respondent. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 388 Wis. 2d 621,935 N.W.2d 553
(2020 – unpublished)

| | |
|---|---|
| OPINION FILED: | June 2, 2021 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | January 11, 2021 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Milwaukee |
| JUDGE: | Glenn H. Yamahiro |

JUSTICES:
ANN WALSH BRADLEY, J., delivered the majority opinion of the Court, in which DALLET, HAGEDORN, and KAROFSKY, JJ., joined. ROGGENSACK, J., filed a dissenting opinion, in which ZIEGLER, C.J., and REBECCA GRASSL BRADLEY, J., joined.
NOT PARTICIPATING:

ATTORNEYS:

For the petitioner-appellant-petitioner, there were briefs filed by *James E. Goldschmidt* and *Quarles & Brady LLP*, Milwaukee. There was an oral argument by *James E. Goldschmidt*.

For the respondent-respondent, there was a brief filed by *James M. Carroll*, assistant city attorney; with whom on the brief was Tearman Spencer, city attorney. There was an oral argument by *James M. Carroll*.

An amicus curiae brief was filed on behalf of The Wisconsin Realtors Association and NAIOP-Wisconsin by *Thomas D. Larson*, Madison.

No. 2018AP669
(L.C. No. 2017CV4572)

STATE OF WISCONSIN          :          IN SUPREME COURT

**State of Wisconsin ex rel. Ronald L. Collison,**

    **Petitioner-Appellant-Petitioner,**

  **v.**

**City of Milwaukee Board of Review,**

    **Respondent-Respondent.**

**FILED**

**JUN 2, 2021**

Sheila T. Reiff
Clerk of Supreme Court

ANN WALSH BRADLEY, J., delivered the majority opinion of the Court, in which DALLET, HAGEDORN, and KAROFSKY, JJ., joined. ROGGENSACK, J., filed a dissenting opinion, in which ZIEGLER, C.J., and REBECCA GRASSL BRADLEY, J., joined.

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1 ANN WALSH BRADLEY, J. The petitioner, Ronald Collison, seeks review of an unpublished per curiam decision of the court of appeals affirming the City of Milwaukee Board of Review's (Board) determination that his property was properly

assessed at a value of $31,800.[1] Collison argues that because the property is contaminated he cannot sell it, and that accordingly the assessed value should be zero dollars.

¶2 Specifically, Collison contends that the assessor erred by basing the assessment on the property's income-generating potential as a parking lot without reducing the value to account for the contamination that is present. He further argues that the City of Milwaukee Environmental Contamination Standards (CMECS) conflict with Wis. Stat. § 70.32 (2017-18).[2]

¶3 We conclude that by utilizing the income approach to value the property according to its highest and best use as a parking lot, the assessor properly considered the impairment of the value of the property due to contamination in arriving at a valuation pursuant to Wis. Stat. § 70.32(1m). Further, we decline to address Collison's challenge to the CMECS because the assessor did not rely on the CMECS in the assessment of Collison's property.

¶4 Accordingly, we affirm the decision of the court of appeals.

---

[1] State ex rel. Collison v. City of Milwaukee Bd. of Rev., No. 2018AP669, unpublished slip op. (Wis. Ct. App. Aug. 27, 2019) (per curiam) (affirming the order of the circuit court for Milwaukee County, Glenn H. Yamahiro, Judge).

[2] All subsequent references to the Wisconsin Statutes are to the 2017-18 version unless otherwise indicated.

I

¶5 Since 1979, Collison has owned a piece of property in downtown Milwaukee. Located two blocks from Fiserv Forum, the new Milwaukee sports arena, it includes a two-story steel and wood framed commercial building and an asphalt parking lot with space for approximately 12-15 vehicles. The building previously housed a dry cleaning business that closed in 2005 and is currently vacant.

¶6 In 2012, the City of Milwaukee issued a permit for the removal of four underground storage tanks on the property. After removal of the tanks, a subsequent soil analysis found contamination from petroleum and perchloroethylene solvents. The soil analysis did not include a statement regarding how much it would cost to remediate the property, and the circuit court ultimately determined that there was no evidence that the soil analysis was presented to the Board during its proceedings.

¶7 For the 2016 assessment year, the City assessed the property and determined the fair market value to be $31,800. As part of this assessment, the City found that the building had no value. In arriving at the $31,800 valuation, the City's assessor used the "income approach," basing the assessment on rental income that could be obtained from the property's existing parking lot. The assessor examined other comparably assessed downtown parking lots and observed that rental income had indeed been collected from the property in the past, as Collison had previously rented nine of the parking spaces, generating $540 per month in income.

¶8 Collison appealed the assessment to the Board. The Board held a hearing, at which Collison and the assessor offered testimony.

¶9 Before the Board,[3] Collison contended "that the property has no assessed value at this time because it has no market value." He explained, "People are not interested in purchasing a property, such as this one, simply because it has contamination on it." Further, Collison asserted that the amount of contamination on the property is such "that anyone that would purchase the property would have to pay for the remediation[,]" the cost of which could reach "perhaps even into the millions of dollars."

¶10 Legally, Collison argued that the assessment was in error because it contravenes Wis. Stat. § 70.32(1m).[4] In Collison's estimation, the assessor did not follow the statute's dictate to consider the impairment of the property's value due to the contamination in arriving at a valuation, and instead followed the CMECS,[5] which indicate that a property is to be

---

[3] Collison represented himself through the petition for review stage of this case, appearing pro se before the Board, the circuit court, and the court of appeals.

[4] Wisconsin Stat. § 70.32(1m) provides: "In addition to the factors set out in sub. (1), the assessor shall consider the impairment of the value of the property because of the presence of a solid or hazardous waste disposal facility or because of environmental pollution, as defined in s. 299.01(4)."

[5] In relevant part, the CMECS set forth:

Burden of Proof on Taxpayer . . . Contamination must be substantiated through an independent environmental

(continued)

4

valued as if it were uncontaminated unless the landowner pays for a "phase II" environmental site assessment detailing the contamination.

¶11 The assessor also testified before the Board. He recognized that the property is contaminated, but stated that "[i]t's just an unknown extent and/or cleanup costs associated with the cleanup with the contamination." Regarding the necessary documentation to establish the extent of the contamination, the following exchange occurred between several Board members and the assessor:

> Mr. Evans [Board member]: So, if the contamination was factually known, would that affect the assessment, value assessment of the property?
>
> Mr. Wiegand [Assessor]: Yes.
>
> Mr. Volkman [Board member]: Will you accept only a phase one, phase two? Or will you accept somebody giving you a quote, as to what it takes?
>
> Mr. Wiegand: Um, we will accept any written, verifiable evidence done by an expert.

---

expert. This step is no different from providing independent appraisals to defend values on appeal. The minimum level of acceptable substantiation will be a comprehensive Phase II Audit, setting forth (among other pertinent information) the type, level and source of contamination and the suggested method or methods for remediation. Without this information, property must be valued as if uncontaminated. All information we obtain from owners/agents regarding potential contamination will be considered open records to the public.

¶12 With regard to his use of the income approach and the consideration of the rental income that could be generated by the on-site parking lot, the assessor testified:

> [T]here is a great need for parking in this area and contaminated sites can be encapsulated and used as parking lots. I think as long as there is potential to——or the owner is using it as a parking lot, we could consider using . . . the income approach, as long as there's income being derived from the site.

¶13 He further explained, "I don't know if the contamination is $50,000, or $800,000. We're valuing the, the parking lot based on its income potential. The potential to park the vehicles at this point, whether contaminated or not . . . and that's how the city is assessing the property."

¶14 The Board ultimately upheld the assessment and Collison sought certiorari review in the circuit court. He renewed the same arguments he made before the Board, namely that the CMECS conflict with Wis. Stat. § 70.32(1m) and that the assessor did not consider the impairment of the property's value due to the contamination as required by § 70.32(1m) and the Wisconsin Property Assessment Manual (WPAM).

¶15 The circuit court affirmed the Board. It did not squarely address Collison's contention that the CMECS conflict with Wis. Stat. § 70.32(1m) because, in its estimation, the record did not demonstrate that the Board or the assessor actually relied on the CMECS requirements. In other words, the circuit court determined that Collison's "arguments fail because the assessor and the Board recognized the contamination even though Petitioner has not completed or sought a Phase II audit."

6

It further explained that "[w]hile the challenged CMECS provision could conceivably result in an assessment that disregards evidence of contamination if a Phase II Audit is not provided, this did not occur with Petitioner's assessment."

¶16 Next, the circuit court determined that "[t]he record does not reveal any error by the assessor in applying the WPAM or the statutes, and Petitioner fails to establish how the City's 2016 assessment deviates from either." In the circuit court's estimation, Collison failed to bring forward "credible evidence to challenge the assessor's conclusion that use of the Income Approach results in an assessed value of $31,800." It reached this conclusion because "Petitioner did not provide the Board with any data contradicting the assessor's calculations, nor did Petitioner suggest an alternative valuation method that would have better reflected the property's fair market value. . . . A mere assertion that no one will purchase the property is insufficient."

¶17 The circuit court further stated that "[t]he assessor did not fail to take into consideration the impairment of the property's value due to contamination as required by Wis. Stat. § 70.32(1m)." Indeed, it concluded that the assessor's use of the income approach was driven by the presence of the contamination: "By determining that the property's highest and best use was to produce income from existing parking spaces, the assessor recognized the very poor condition of the land and difficulty of future development for a better use such as a high end apartment building or similar commercial use."

7

¶18 Collison appealed, and the court of appeals affirmed. State ex rel. Collison v. City of Milwaukee Bd. of Rev., No. 2018AP669, unpublished slip op. (Wis. Ct. App. Aug. 27, 2019) (per curiam). The court of appeals determined that "Collison has not shown why his unsubstantiated claim that the property has a market value of zero dollars is more accurate than [the assessor's] decision to use an income approach to determine market value based on the best use of the property as a parking lot." Id., ¶6. Further, the court of appeals agreed with the circuit court's determination that the challenge to the CMECS was not ripe for determination. Id., ¶7. It thus concluded that "the assessor did not ignore the contamination of the property in valuing it, and the Board did not ignore the contamination in upholding that valuation." Id. Collison petitioned for this court's review.

II

¶19 This case arrives here on certiorari review. "Certiorari is a mechanism by which a court may test the validity of a decision rendered by a municipality, an administrative agency, or an inferior tribunal." Ottman v. Town of Primrose, 2011 WI 18, ¶34, 332 Wis. 2d 3, 796 N.W.2d 411.

¶20 On certiorari review, we examine the decision of the board of review, not the decision of the circuit court or court of appeals. Sausen v. Town of Black Creek Bd. of Rev., 2014 WI 9, ¶5, 352 Wis. 2d 576, 843 N.W.2d 39; see Wis. Stat. § 70.47(13). Our review is limited to whether the board's actions were: (1) within its jurisdiction; (2) according to

8

law; (3) arbitrary, oppressive, or unreasonable and represented its will and not its judgment; and (4) supported by evidence such that the board might reasonably make the order or determination in question. Sausen, 352 Wis. 2d 576, ¶6.

¶21 In our review, we must engage in statutory interpretation. The interpretation of a statute presents a question of law this court reviews independently of the determinations rendered by the circuit court and court of appeals. Hinrichs v. DOW Chem. Co., 2020 WI 2, ¶26, 389 Wis. 2d 669, 937 N.W.2d 37.

### III

¶22 We begin with a review of the statutory background underlying this case, including general tax assessment methodology pursuant to Wis. Stat. § 70.32 and this court's precedent. Subsequently, we discuss the law related to contaminated property and examine Collison's contention that the assessment in this case contravened the statutory mandate that contamination of property be considered in arriving at a valuation.

### A

¶23 Valuation of real estate for tax assessment purposes is governed by Wis. Stat. § 70.32. Subsection (1) of this statute dictates that property shall be valued "in the manner specified in the Wisconsin property assessment manual" and additionally sets forth a hierarchical valuation methodology. Metro. Assocs. v. City of Milwaukee, 2018 WI 4, ¶31, 379 Wis. 2d 141, 905 N.W.2d 784.

¶24 As clarified in State ex rel. Markarian v. City of Cudahy, 45 Wis. 2d 683, 686, 173 N.W.2d 627 (1970), the text of Wis. Stat. § 70.32(1) lists three sources of information in a specific order, with this order being indicative of the quality of information each source provides. Metro. Assocs., 379 Wis. 2d 141, ¶31. This methodology has been described by courts as providing three "tiers" of analysis. Id. (citation omitted).

¶25 The best information of a property's fair market value is an arm's-length sale of the subject property. Id., ¶32. Examination of a recent arm's length sale is known as a "tier 1" analysis. Id. This is the first source of information an assessor should look to in conducting an assessment. If there is no recent sale of the subject property, the appraiser then moves to tier 2, examining recent, arm's-length sales of reasonably comparable properties (the "sales comparison approach"). Id., ¶33.

¶26 When both tier 1 and tier 2 are unavailable, an assessor then moves to tier 3. Id., ¶34. Under tier 3, an assessor may consider all the factors collectively which have a bearing on value of the property in order to determine its fair market value. Id. These factors include cost, depreciation, replacement value, income, industrial conditions, location and occupancy, sales of like property, book value, amount of insurance carried, value asserted in a prospectus and appraisals produced by the owner. Id. (citing State ex rel. Mitchell Aero, Inc. v. Bd. of Rev. of City of Milwaukee, 74 Wis. 2d 268, 278, 246 N.W.2d 521 (1976)). As relevant here, the income approach,

10

"which seeks to capture the amount of income the property will generate over its useful life," fits under the umbrella of tier 3 analysis. Metro. Assocs., 379 Wis. 2d 141, ¶34.

B

¶27 With this necessary general background on assessment methodology in hand, we address next the law related to contaminated property and examine Collison's argument that the assessor did not properly consider the contaminated nature of the property in arriving at a valuation. Viewed within the certiorari review framework, Collison's argument is one that the Board did not act according to law when it upheld the assessment.

¶28 The requirement that an assessor consider a property's contamination arises from Wis. Stat. § 70.32, which contains a provision directed at contaminated properties. Specifically, § 70.32(1m) sets forth: "In addition to the factors set out in sub. (1), the assessor shall consider the impairment of the value of the property because of the presence of a solid or hazardous waste disposal facility or because of environmental pollution, as defined in s. 299.01(4)."[6]

---

[6] Pursuant to Wis. Stat. § 299.01(4), "environmental pollution" is defined as "the contaminating or rendering unclean or impure the air, land or waters of the state, or making the same injurious to public health, harmful for commercial or recreational use, or deleterious to fish, bird, animal or plant life."

11

¶29 Guidance on valuing contaminated property is provided by the WPAM. See Wis. Stat. § 70.32(1) (explaining that property "shall be valued by the assessor in the manner specified in the Wisconsin property assessment manual"). It acknowledges the "unique valuation problem" posed by contaminated property due to the difficulty in identifying contamination. 1 Wisconsin Property Assessment Manual 8-42 (2016).[7] Despite the identified difficulty, the WPAM reinforces that "[b]oth Wisconsin Statutes and appraisal principles require the assessor to consider the effect of contamination on the value of real estate." Id. at 8-43 (citing § 70.32(1m)).

¶30 Largely, the WPAM addresses "more common situations where the extent of contamination and its effect on value are readily identified and measured." Id. at 8-46. However, it also recognizes that "there may be some situations where the extent of contamination is unknown and thus the effect on value is difficult to measure." Id. In such a situation, "it is not possible to develop specific procedures for dealing with this uncertainty," but the WPAM provides assessors with a framework for gathering information "to help estimate the effect of contamination on value." Id.

¶31 By way of example, the WPAM provides:

> [A]lthough there may not be sales of truly comparable contaminated property, there may be sales of other contaminated property indicating a range of values or,

---

[7] All references to the Wisconsin Property Assessment Manual are to the 2016 version unless otherwise indicated.

possibly, a percentage adjustment the assessor can use to reflect the contamination. Similarly, although an environmental engineer may not be able to estimate a specific cost to cure the contamination, the engineer may be able to estimate a range of costs and what are the probabilities that the cost to cure lies on the high or low end of the range. Properties with a great deal of uncertainty should be closely monitored and reviewed each year as more information becomes available to reduce the degree of uncertainty.

Id.

¶32 In this case, the parties agree that the subject property is contaminated, but the extent of that contamination is unknown. As to the method of valuation, the assessor here utilized the income approach to value Collison's property. There had been no arm's length sale of the property, and the assessor testified that "[t]he cost approach and the sales comparison approach were not applicable."

¶33 Collison argues that the assessor did not properly consider the property's contaminated nature in arriving at the valuation of $31,800. In Collison's view, considering the contamination cannot equate with merely using the income approach instead of the sales approach, and it cannot equate with merely assigning no value to the building. He argues, contrary to the assessor's determination, that the property actually has no value whatsoever because it cannot be sold.

¶34 We are unpersuaded by Collison's argument. Contrary to Collison's contention, the fact that the property is contaminated drove the entire assessment in this case, as will be further explained below.

13

¶35 As we must, we begin with the language of Wis. Stat. § 70.32(1m) and its requirement that the assessor "consider the impairment of the value of the property" due to contamination. See State ex rel. Kalal v. Circuit Court for Dane Cnty., 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110. "Statutory language is given its common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning." Id. We also interpret statutory language "in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results." Id., ¶46.

¶36 In the context of this case, we must determine what it means for the assessor to "consider" the impairment of the value of the property caused by the contamination. Looking to an established dictionary for assistance, we observe that "consider" is defined as "to take into account."[8] Thus, we must determine whether the assessor here took into account the impairment of the value of the property caused by the contamination in arriving at the valuation of $31,800.

---

[8] Consider, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/consider (last visited May 27, 2021); see also State v. Sample, 215 Wis. 2d 487, 499, 573 N.W.2d 187 (1998) ("For purposes of statutory interpretation or construction, the common and approved usage of words may be established by consulting dictionary definitions.").

14

¶37 In this task, we begin with the proposition that "real estate must be valued at its highest and best use." Allright Props., Inc. v. City of Milwaukee, 2009 WI App 46, ¶18, 317 Wis. 2d 228, 767 N.W.2d 567. Applied here, the assessor determined that, given the property's location and taking into account the presence of contamination, the highest and best use in its current state is a parking lot.

¶38 Indeed, the assessor testified about the potential for income:

> [T]here is a great need for parking in this area and contaminated sites can be encapsulated and used as parking lots. I think as long as there is potential to——or the owner is using it as a parking lot, we could consider using . . . the income approach, as long as there's income being derived from the site.

Thus, as this testimony demonstrates, it was the contamination that drove the assessor's decision to use the income approach to value the property, and to value the property according to its highest and best use as a parking lot.

¶39 The record reflects a recognition that the property could have been valued much higher but for the contamination. The property is in a prime location near the new Milwaukee Bucks stadium. One of the Board members stated at the hearing that "with all the development that's happening in that area, . . . this property could be worth a lot of money once the groundwater and the soil has been remediated."

¶40 It follows from this that if the property were not contaminated, a parking lot would no longer be the highest and best use of the property. By valuing the property as a parking

15

lot using the income approach, the assessor took into account, or "considered," the impairment of the value of the property due to contamination in accordance with Wis. Stat. § 70.32(1m).[9]

¶41 Although the WPAM itself provides no specific procedure for dealing with uncertainty like that presented here, see 1 Wisconsin Property Assessment Manual 8-46, the assessor's consideration of the impairment of the value of the property due to contamination by valuing the property as a parking lot using the income approach was consistent with the International Association of Assessing Officers (IAAO) standards, which are incorporated by the WPAM.[10] Specifically, IAAO Standard on the Valuation of Properties Affected by Environmental Contamination § 4.1 discusses the value in use of a contaminated property and provides in relevant part that "[v]alue in use suggests that a property which is still in use, or which can be used in the near future, has a value to the owner." It further specifies that "[t]his would be true even if costs to cure environmental

---

[9] The dissent contends that in order to "consider" the impairment of the value due to contamination, the assessor's report must demonstrate a reduction in value by a specific number. See dissent, ¶¶68, 74. Such a requirement finds no support in the text of Wis. Stat. § 70.32(1m). The statute requires only that the assessor "consider" the impairment of value due to contamination, not that he "reduce the value by a certain number from the value of the property if it were not contaminated." See Wis. Stat. § 70.32(1m).

[10] "Whether or not the IAAO Standards appear in the WPAM, the most current version in effect on January 1 of a given assessment year is incorporated by reference in the manual." 1 Wisconsin Property Assessment Manual 1-3.

problems exceed the nominal, unencumbered value. The value in use will most nearly reflect the market value of the property . . . ." Int'l Ass'n of Assessing Officers, Standard on the Valuation of Properties Affected by Environmental Contamination § 4.1 (2016).[11]

¶42 The assessment here is consistent with this principle. It recognizes that the highest and best use of the property as a parking lot has value to the owner even if the cost to cure environmental problems exceeds the value of the property.

¶43 Additionally, Collison's argument that the property has no value whatsoever is unpersuasive for two reasons.[12] First, it ignores the established three-tiered valuation methodology. By arguing that the value is zero because it cannot be sold, Collison urges the court to require the assessor to use either an arms-length sale or sales comparison approach and go no further. Collison's proposed approach ignores the tier 3 approaches that the law dictates the assessor must use in the absence of information on tiers 1 and 2.

---

[11] All references to the IAAO Standard on the Valuation of Properties Affected by Environmental Contamination refer to the 2016 version unless otherwise indicated.

[12] See also Bonnie H. Keen, Tax Assessment of Contaminated Property: Tax Breaks for Polluters?, 19 B.C. Env't Aff. L. Rev. 885, 906-08 (1992) (explaining that "the majority of cases have rejected taxpayers' assertions of zero or nominal value" and collecting cases); Peter J. Patchin, Valuation of Contaminated Properties, 56 Appraisal J. 7, 13 (1988) (stating that a conclusion that contaminated property is "worthless" is "unreasonable when the property is still being utilized by its present owner for some useful purpose").

¶44 Second, Collison's argument ignores that it is Collison's burden to present evidence before the Board to support his proposed valuation of zero, which he did not do. See Sausen, 352 Wis. 2d 576, ¶10. Like our case law, the IAAO standards make clear that in a case of contamination, the burden is on the taxpayer to demonstrate the extent of the damage. Int'l Ass'n of Assessing Officers, Standard on the Valuation of Properties Affected by Environmental Contamination § 5.1 ("The property owner must provide clear documentation of the nature and extent of environmental contamination. Accurate and detailed maps must be included as part of this documentation.") By imploring the court to adopt a value of zero for his property despite not presenting evidence to support such a theory, Collison is asking the court to allow him to sidestep his burden, which we will not do.

¶45 As a final matter, we decline to address the additional issue presented in Collison's petition for review and briefing, i.e., whether the CMECS conflict with Wis. Stat. § 70.32(1m).[13] Although Collison asserts that the CMECS unlawfully require a phase II assessment, the assessor testified that he would have accepted "any written, verifiable evidence

---

[13] The dissent states that "[w]e asked the parties to address whether MECS were consistent with the statutes." Dissent, ¶77. Such a statement could be read to indicate that the court sua sponte asked the parties to brief the question. That is not correct——the issue was raised in Collison's petition for review.

done by an expert[,]" and not only a phase II assessment of the property as evidence of contamination.

¶46 As both the circuit court and court of appeals determined, the Board did not reject Collison's challenge on the basis that he lacked a phase II assessment. The legal question Collison presents, while interesting, is not reachable on the facts of this case. We will therefore not depart from our general practice that this court will not offer an advisory opinion or make a pronouncement based on hypothetical facts. State v. Grandberry, 2018 WI 29, ¶31 n.20, 380 Wis. 2d 541, 910 N.W.2d 214.

¶47 In sum, we conclude that by utilizing the income approach to value the property according to its highest and best use as a parking lot, the assessor properly considered the impairment of the value of the property due to contamination in arriving at a valuation pursuant to Wis. Stat. § 70.32(1m). Further, we decline to address Collison's challenge to the CMECS because the assessor did not rely on the CMECS in the assessment of Collison's property.

¶48 Accordingly, we affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶49 PATIENCE DRAKE ROGGENSACK, J. *(dissenting).* As the City of Milwaukee's appraiser, Jim Wiegand, said, "we recognize the site is contaminated." Once the presence of contamination is found on a property, Wis. Stat. § 70.32(1m) requires the taxation assessor[1] to consider the "impairment of the value of the property" that is due to contamination. However, Wiegand's appraisal, upon which the assessor relied, did not follow § 70.32(1m). Instead, it appears that Wiegand applied the Milwaukee Environmental Contamination Standards (MECS), which directed the appraiser to value the property "as if uncontaminated" unless the taxpayer meets MECS's burden of proving the costs of clean-up.

¶50 I respectfully dissent because the majority opinion affirms the Board of Review's decision sustaining Wiegand's appraisal, which appraisal did not follow the law.[2] I also write because I conclude that MECS do not comply with Wis. Stat. § 70.32(1m) and therefore, it is unlawful to apply MECS in taxation appraisals of contaminated properties.

I. BACKGROUND

¶51 The City agrees that Ronald Collison's property is environmentally contaminated. The contamination was caused by leaking from underground storage tanks that once contained

---

[1] The City of Milwaukee is the assessor of taxes due on real estate within its boundaries. Wiegand is the appraiser for the City who determined the market value of the property.

[2] Majority op., ¶3.

petroleum products and perchloroethylene, solvents used in a dry cleaning business that operated on the property in 1979 when Collison purchased it. As Board member, Volkman, pointed out, the City has long been aware of the contamination because the City built an alley on the edge of Collison's property and found evidence of these pollutants leaching into city property. He was surprised that the City did not do anything about cleaning up the contamination.

¶52 Wiegand's appraisal recognized the contamination and related that "owner has provided a copy of a Tank System Site Assessment Report (TSSA) dated July 19, 2012 from Endpoint Solutions. This report details the removal of four underground storage tanks (UST's) and a comprehensive analytical soil sample report."[3] The appraisal continues to relate that the "Report [of Endpoint Solutions] did not make any recommendations regarding cost or remediation. . . . The owner has not provided any report detailing clean-up costs. Lacking detailed, a Phase II environmental study, it remains unclear as to the extent of contamination that exists on the site or any associated clean-up costs."[4]

---

[3] Appraisal, Non-Electronic Record Item, p. 4.

[4] Id.

## II. DISCUSSION

### A. Standard of Review

¶53 We review the decision of the Board of Review, not the decision of the circuit court or the court of appeals. Steenberg v. Town of Oakfield, 167 Wis. 2d 566, 571, 482 N.W.2d 326 (1992). Our review is under certiorari standards where we determine whether the Board's actions were: (1) within its jurisdiction; (2) according to law; (3) arbitrary, oppressive, or unreasonable and represented its will and not its judgment; and (4) supported by evidence such that the Board might reasonably make the decision now under review. Sausen v. Town of Black Creek Bd. of Rev., 2014 WI 9, ¶¶5, 6, 352 Wis. 2d 576, 843 N.W.2d 39.

¶54 Our review falls under the second certiorari standard because Collison claims that the Board of Review did not act according to the requirements of Wis. Stat. § 70.32(1m), i.e., that it did not act according to law. Although the Board presumes that the valuation is correct pursuant to Wis. Stat. § 70.47(8)(i), there is no presumption that the Board acted according to law when it adopted Wiegand's valuation. Rather, "[w]hether the Board acted according to law is a question of law that we decide independently." State ex rel. Peter Ogden Fam. Tr. of 2008 v. Bd. of Rev., 2019 WI 23, ¶24, 385 Wis. 2d 676, 923 N.W.2d 837. In order to resolve whether the Board acted according to law, we interpret and apply § 70.32(1m). Again, these tasks present questions of law that we decide

independently of the decisions of the Board, the circuit court and the court of appeals. Id.

### B. Relevant Statutes

¶55 Real estate is valued for taxation purposes by the criteria set out in Wis. Stat. § 70.32. Provisions relevant to Wiegand's appraisal of Collison's property provide:

(1) Real property shall be valued by the assessor in the manner specified in the Wisconsin property assessment manual provided under s. 73.03(2a) . . . at the full value which could ordinarily be obtained therefor at private sale. In determining the value, the assessor shall consider recent arm's-length sales of the property to be assessed . . . ; recent arm's-length sales of reasonably comparable property; and all factors that, according to professionally acceptable appraisal practices, affect the value of the property to be assessed.

. . . .

(1m) In addition to the factors set out in sub. (1), the assessor shall consider the impairment of the value of the property because of the presence of . . . environmental pollution, as defined in s. 299.01(4).

§ 70.32.

¶56 Collison claims that the City did not act in accord with Wis. Stat. § 70.32(1m) because he provided proof that his property was contaminated, but the City did not consider the impairment of the value of the property because of contamination as § 70.32(1m) requires. Rather, the City contended that Collison was required to provide "verifiable written evidence pertaining to the extent or cleanup costs" for the contamination in order to have his property value reduced. Accordingly, the

interpretation and application of § 70.32(1)(m) are central to the case before us.

## C.  Wiegand's Appraisal

¶57 Wiegand used the income approach to value Collison's property.  He did so by following the 2016 Wisconsin Property Assessment Manual (WPAM),[5] as Wis. Stat. § 70.32(1) directs, and by employing MECS to the acknowledged contamination.  In order to place issues in the context this case presents, a brief review of principles that underlie taxation appraisals will be helpful.

¶58 Assessments for taxation purposes are valid for the current year, with Wis. Stat. § 70.10 establishing the assessment date as January first.  "The assessment is based on the status of the property as of the close of that day."[6]

¶59 As WPAM explains, "There are three traditional approaches to developing the opinion of value: the sales comparison approach, the cost approach, and the income approach."[7]  For taxation valuations, the "Markarian hierarchy" is used.[8]  State ex rel. Kesselman v. Bd. of Rev. for Vill. of Sturtevant, 133 Wis. 2d 122, 128-34, 394 N.W.2d 745 (1986).  The Markarian hierarchy requires:

---

[5] All references to the Wisconsin Property Assessment Manual are to the 2016 version.

[6] Wisconsin Property Assessment Manual (WPAM) at 7-21.

[7] Id. at 7-22.

[8] Id. at 7-23.

[A]ssessors to first use a recent arm's length sale of the subject property. If there is no such sale, the next step is to use recent comparable sales of other properties. Only if there are no recent comparable sales of other properties should the assessor proceed to other indicators of value that include the income and cost approaches to value.[9]

¶60 Valuation by the income approach employs capitalization of income, as explained in WPAM. "This method assumes the gross rental under a ground lease is at current market levels. Net rental after deduction of the owner's expenses (insurance, management) is capitalized at an appropriate rate into an estimate of land value."[10] Direct capitalization, as described in WPAM, was used by Wiegand to determine the value of Collison's property.[11]

¶61 WPAM also addresses contaminated properties "where the extent of contamination is unknown and thus the effect on value is difficult to measure."[12] In those circumstances, the guidelines in ch. 8 of WPAM "provide a framework the assessor can use to gather information to help estimate the effect of contamination on value."[13] Contamination attaches a stigma to property "that makes it less desirable than comparable properties."[14]

---

[9] Id. (citing State ex rel. Markarian v. City of Cudahy, 45 Wis. 2d 683, 686, 173 N.W.2d 627 (1970)).

[10] Id. at 9-11.

[11] Id. at 9-15; Appraisal, Non-Electronic Record Item, p. 4.

[12] WPAM at 8-46.

[13] Id.

[14] Id.

¶62 There is nothing in Wiegand's income-based valuation that refers to impairment of value, even though Wiegand's appraisal confirmed both his knowledge of contamination and his receipt of a detailed contamination report from Endpoint Solutions. Rather, Wiegand supported using his $31,800 valuation as the appraisal for taxation with the following statement: "As of January 1st 2016, The City of Milwaukee Assessor Office did not have any verifiable written information pertaining to the extent or clean-up costs associated with any perceived contamination at the subject property."[15]

D. Wisconsin Stat. § 70.32(1m)

¶63 The purposes of statutory interpretation and application are to apply the meaning of the words the legislature chose to undisputed facts presented. Jefferson v. Dane Cnty., 2020 WI 90, ¶21, 394 Wis. 2d 602, 951 N.W.2d 556. Wisconsin Stat. § 70.32(1m) provides:

> In addition to the factors set out in sub (1), the assessor shall consider the impairment of the value of the property because of the presence of . . . environmental pollution, as defined in s. 299.01(4)."[16]

¶64 I begin by interpreting the plain meaning of the words that the legislature chose. State v. Mercado, 2021 WI 2, ¶43,

---

[15] Appraisal, Non-Electronic Record Item, p. 7.

[16] Wisconsin Stat. § 299.01(4) provides that "'Environmental pollution' means the contaminating or rendering unclean or impure the air, land or waters of the state, or making the same injurious to public health, harmful for commercial or recreational use, or deleterious to fish, bird, animal or plant life."

7

395 Wis. 2d 296, 953 N.W.2d 337. "'Statutory language is given its common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning.'" Id. (quoting State ex rel. Kalal v. Circuit Court for Dane Cnty., 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110).

¶65 The plain meaning of the words the legislature chose for Wis. Stat. § 70.32(1m) places two duties on the assessor when property is contaminated. First, the assessor is to apply the assessment factors in subsection (1), which require the use of WPAM and the Markarian hierarchy that I explained above. Second, "the assessor shall consider the impairment of the value of the property" due to contamination. Stated otherwise, subsection (1m) places an affirmative obligation on the assessor to act. It requires that the effect of contamination on the value of the property be addressed by the assessor.

¶66 Focusing on the term, "impairment," I note that common synonyms for impairment are: damage, injury, and loss. Thesaurus, Microsoft January 27, 2021. A common dictionary definition for impairment is that which is "diminished in some material respect." Webster's New Collegiate Dictionary, 574 (1974).

¶67 The assessor is to "consider" the impairment. Deliberate, ponder and think-through are all synonyms for consider. Thesaurus, Microsoft January 27, 2021. All synonyms require the assessor to take some action because of the

impairment caused by contamination of the property. He is not free to ignore the impairment.

¶68 However, Wiegand's appraisal never mentions "impairment" or any other synonym to show that he considered the effect of contamination on the value of the property. By ignoring impairment, he failed to provide an appraisal in compliance with the legislature's directive in Wis. Stat. § 70.32(1m). Stated otherwise, the value he found by the income approach was not diminished in any respect because of the presence of contamination.[17]

¶69 Instead of following the statutory directive, Wiegand's appraisal placed additional requirements on Collison. For example, Wiegand says that the owner should have provided "verifiable written information pertaining to the extent or cleanup costs associated with any perceived contamination on the subject property." However, there is nothing in Wis. Stat. § 70.32(1m) that requires, or even suggests, that the owner do so. The legislature placed all the duties found in § 70.32(1m) on the assessor, not on the property owner.

¶70 Because the Board of Review sustained Wiegand's appraisal, which was not prepared consistent with Wis. Stat. § 70.32(1m), the Board's decision was not made according to law.

---

[17] I do not contest that the property owner must show that the property is contaminated before the burden of Wis. Stat. § 70.32(1m) applies to the assessor. However, here, Collison provided an environmental report from Endpoint Solutions showing contamination, and all parties agreed that the property was contaminated.

9

Therefore, I would reverse its decision and remand to the Board so that it can request an appraiser to consider the impairment of value caused by contamination as § 70.32(1m) requires.[18]

### E.  Majority Opinion

¶71 The majority opinion asserts that the assessor did consider the impairment due to contamination because the appraiser valued the property based on the income approach.[19]  To support this assertion, the majority quotes the appraiser's statement that there is a "need for parking in this area and contaminated sites can be encapsulated and used as parking lots."[20]  The majority then concludes that "it was the contamination that drove the assessor's decision to use the income approach to value the property."[21]  This conclusion ignores Exhibit 3, prepared by Wiegand, as his written valuation report, and it also ignores the Markarian hierarchy that must be used for taxation appraisals according to WPAM and Wis. Stat. § 70.32(1).

¶72 I begin with the appraiser's report.  Prior to calculating the market value under the income approach that is before us in this review, Wiegand noted that he could not use other valuation methods for this property.  He explained that

---

[18] I take no position on the dollar valuation of the impairment due to contamination.  That is a matter left to the professional expertise of an appraiser.

[19] Majority op., ¶3.

[20] Majority op., ¶38.

[21] Id.

10

"the Direct Sales Comparison Approach was considered but not applied due to difficulty finding sales of similar properties."[22] He also considered the cost approach to value, but concluded it was not "the most reliable indication of value for the subject property given the age of the structure and difficulties in estimating depreciation."[23] It was only after determining that other valuation approaches were not available that Wiegand moved to the income approach where he applied direct capitalization of income to determine value.

¶73 The appraiser's report contained a step-by-step calculation from which he derived the market value of $31,800. It shows in clear terms that he did not employ an income-based valuation due to his consideration of contamination. Rather, he employed direct capitalization of income because he was following the Markarian hierarchy required by WPAM, and it was the one valuation method available for this property. First, he determined projected annual revenue based on what Collison had been paid in the past. Next, he deducted an amount equivalent to a 30 percent vacancy rate as an expense. Then, he capitalized the resulting number, $4,082, by 12.841 percent, which was "a market derived capitalization rate of 10.00% plus an effective tax rate of 2.841%."[24] Under the Markarian approach

---

[22] Appraisal, Non-Electronic Record Item, p. 5.

[23] Id.

[24] Report of Jim Wiegand, Senior Property Appraiser, Exhibit 3, p. 6.

11

to taxation valuation, the income method is appropriate when recent sales or comparable sales are not available.[25] State ex rel. Markarian v. City of Cudahy, 45 Wis. 2d 683, 686-87, 173 N.W.2d 627 (1970). That is what happened here.

¶74 I have no problem with the value the appraiser calculated through direct capitalization of income. His calculations were properly done. My objection is that he did not reduce the $31,800 value by any amount based on "impairment of the value of the property because of the presence of [] environmental pollution" as Wis. Stat. § 70.32(1m) requires.

¶75 There simply are no facts from which to conclude that Wiegand used the capitalization of income approach to consider the effect of environmental contamination on the value of Collison's property as the majority opinion has done. In order to come to its conclusion, the majority opinion ignored Wiegand's step-by-step valuation that is set out in Exhibit 3. His testimony and the exhibit he prepared belie the majority opinion's conclusion.

¶76 Furthermore, the majority's conclusion that Wiegand used the income approach to consider impairment of the property's value due to contamination is new law, without citation to authority or reasoning to support it. The majority opinion will create unending confusion in what has been a consistent approach to taxation valuations where capitalization of income has been well accepted as part of the Markarian

---

[25] WPAM at 7-23 (citing Markarian, 45 Wis. 2d at 685-86).

hierarchy when comparable sales are not available,[26] but never before used to "consider the impairment of the value of the property because of . . . environmental pollution." Wis. Stat. § 70.32(1m).

### F. MECS Validity

¶77 We asked the parties to address whether MECS were consistent with the statutes. Because they give burdens to property owners that are inconsistent with the plain meaning of Wis. Stat. § 70.32(1) and (1m), I conclude that they are unlawful and their use should be discontinued in regard to valuations of contaminated property.

¶78 As foundation for the following discussion, I review what MECS require of the taxpayer and the appraiser in regard to valuing contaminated property. First, MECS place a "BURDEN OF PROOF ON TAXPAYER."[27] MECS require the taxpayer to prove that contamination exists: "The appraiser should not assume that a specific property type has contamination without appropriate substantiating evidence."[28] Second, "[c]ontamination must be substantiated through an independent environmental expert. . . . The minimum level of acceptable substantiation will be a comprehensive Phase II Audit, setting forth (among other pertinent information) the type, level and source of

---

[26] WPAM at 7-23.

[27] Milwaukee Environmental Contamination Standards (MECS) at A-App. 057.

[28] Id.

contamination and the suggested method or methods for remediation."[29]  Third, "[w]ithout this information, property must be valued as if uncontaminated."[30]  Fourth, reductions in valuations are tied to clean up costs: "Adjustments to the assessments will be based on clean up costs with consideration of discounting these costs for time."[31]  Fifth, "[p]roperty assessments which have been adjusted for contamination shall be designated as unfinished ("U" symbol) assessment."[32]

¶79 Here, Collison provided a contamination report from Endpoint Solutions.  It detailed the removal of four underground storage tanks and provided "a comprehensive analytical soil sample report"[33] of environmental contamination.  In addition, all parties agreed that Collison's property was contaminated.  Therefore, despite MECS's Phase II requirement, the assessor's duties under Wis. Stat. § 70.32(1m) were clearly triggered in this case.

¶80  In his Appraisal Report, Wiegand explained that one of the purposes of his appraisal was that it be in accord with "procedures of the City of Milwaukee Assessor's Office," i.e., MECS.[34]  He also said that the City Assessor's Office did not

---

[29] Id.

[30] Id.

[31] Id. at A-App. 058.

[32] Id.

[33] Appraisal, Non-Electronic Record Item, p. 4.

[34] Id., p. 2.

14

have any verifiable written information pertaining to the clean-up costs associated with contamination of Collison's property. From this statement and his failure to address impairment of value due to contamination, it appeared that he applied MECS's requirement that without a Phase II report showing the costs of clean-up the property is to be assessed as if uncontaminated.

¶81 Wiegand's appraisal ignored all impairment of the value of Collison's property due to contamination, as his written report, Exhibit 3, explained in step-by-step detail. This is confirmed by the MECS directive set forth in the following footnote.[35] And finally, under MECS, if Wiegand had considered an impairment due to contamination, he would have specially marked his assessment because MECS provides that property assessments "adjusted for contamination shall be designated as unfinished ("U" symbol) assessment." The assessment for Collison's property did not have a "U" symbol showing that it had been adjusted for contamination.

### III. CONCLUSION

¶82 In conclusion, I respectfully dissent because the majority opinion affirms the Board of Review's decision sustaining Wiegand's appraisal, which appraisal did not follow the law.[36] I also write because I conclude that MECS do not

---

[35] As MECS provides, "The starting point for determining market value for properties affected by contamination is the unencumbered, or unimpaired value. This is the value that a property would have if no adjustment were made for any environmental problems. Unencumbered value is obtained using standard appraisal methods." MECS at A-App. 064.

[36] Majority op., ¶3.

15

comply with Wis. Stat. § 70.32(1m) and therefore, it is unlawful to apply MECS in taxation appraisals of contaminated properties.

¶83 I am authorized to state that Chief Justice ANNETTE KINGSLAND ZIEGLER and Justice REBECCA GRASSL BRADLEY join this dissent.

16